# In The
# United States Court of Appeals
### For The Fourth Circuit

**DISABILITY RIGHTS SOUTH CAROLINA; ABLE SOUTH CAROLINA; AMANDA MCDOUGALD SCOTT, individually and on behalf of P.S., a minor; MICHELLE FINNEY, individually and on behalf of M.F., a minor; LYUDMYLA TSYKALOVA, individually and on behalf of M.A., a minor; EMILY POETZ, individually and on behalf of L.P., a minor; SAMANTHA BOEVERS, individually and on behalf of P.B., a minor; TIMICIA GRANT, individually and on behalf of E.G., a minor; CHRISTINE COPELAND, individually and on behalf of L.C., a minor; HEATHER PRICE, individually and on behalf of H.P., a minor; and CATHY LITTLETON, individually and on behalf of Q.L., a minor,**

*Plaintiffs–Appellees,*

v.

**HENRY MCMASTER, in his official capacity as Governor of the State of South Carolina; and ALAN WILSON, in his official capacity as Attorney General of South Carolina**

*Defendants–Appellants,*

AND

**MOLLY SPEARMAN, in her official capacity as State Superintendent of Education; GREENVILLE COUNTY SCHOOL DISTRICT; HORRY COUNTY SCHOOL DISTRICT; LEXINGTON COUNTY SCHOOL DISTRICT ONE; OCONEE COUNTY SCHOOL DISTRICT; DORCHESTER COUNTY SCHOOL DISTRICT TWO; CHARLESTON COUNTY SCHOOL DISTRICT; and PICKENS COUNTY SCHOOL DISTRICT,**

*Defendants.*

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF SOUTH CAROLINA

────────────

### SUPPLEMENTAL BRIEF OF APPELLANTS

────────────

*(Counsel listed on following page)*

Alan Wilson
*Attorney General*
Robert D. Cook
*Solicitor General*
J. Emory Smith, Jr.
*Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 11549
Columbia, South Carolina 29211
(803) 734-3680
rcook@scag.gov
esmith@scag.gov

*Counsel for*
*Attorney General Wilson*

Thomas A. Limehouse, Jr.
*Chief Legal Counsel*
Wm. Grayson Lambert
*Senior Legal Counsel*
Michael G. Shedd
*Deputy Legal Counsel*
OFFICE OF THE GOVERNOR
South Carolina State House
1100 Gervais Street
Columbia, South Carolina 29201
(803) 734-2100
tlimehouse@governor.sc.gov
glambert@governor.sc.gov
mshedd@governor.sc.gov

*Counsel for Governor McMaster*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION .................................................................................... 1

ARGUMENT............................................................................................ 3

    I.    The Proviso is a funding provision like the Hyde Amendment.................... 3

    II.    Federal courts lack jurisdiction over the State's funding decision .............. 8

        A.    The Constitution reserves funding decisions to the States as a part of their retained sovereignty ...................................................................... 8

        B.    The district court wrongly exercised jurisdiction over the State's funding decision...................................................................................... 13

CONCLUSION........................................................................................ 19

# TABLE OF AUTHORITIES

## Cases

*Bacon v. City of Richmond, Va.*,
475 F.3d 633 (4th Cir. 2007) .................................................. 9, 18, 19

*Biggs v. Bd. of Ed. of Cecil Cty., Md.*,
229 F. Supp. 2d 437 (D. Md. 2002)....................................................15

*Bristol-Myers Squibb Co. v. Superior Court*,
137 S. Ct. 1773 (2017)....................................................9

*CVLR Performance Horses, Inc. v. Wynne*,
792 F.3d 469 (4th Cir. 2015) ..............................................12

*DIRECTV, Inc. v. Tolson*,
513 F.3d 119 (4th Cir. 2008) ..............................................10

*Doyle v. Hogan*,
1 F.4th 249 (4th Cir. 2021) ..............................................13

*Ex parte Young*,
209 U.S. 123 (1908)..............................................13

*Fam. Plan. Ass'n of Me. v. U.S. Dep't of Health & Hum. Servs.*,
404 F. Supp. 3d 286 (D. Me. 2019)....................................................11

*Fed. Mar. Comm'n v. S.C. State Ports Auth.*,
535 U.S. 743 (2002)....................................................8, 15

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,
204 F.3d 149 (4th Cir. 2000) ..............................................12

*Gregory v. Ashcroft*,
501 U.S. 452 (1991)..............................................8

*Harris v. McRae*,
448 U.S. 297 (1980).................................................. 3, 4, 19

*Horne v. Flores*,
   557 U.S. 433 (2009) ........................................................................10

*Kelley v. Metro. Cty. Bd. of Educ. of Nashville & Davidson Cty., Tenn.*,
   836 F.2d 986 (6th Cir. 1987) ........................................................11

*Lawyer v. Hilton Head Pub. Serv. Dist. No. 1*,
   220 F.3d 298 (4th Cir. 2000) ........................................................10

*Maher v. Roe*,
   432 U.S. 464 (1977) ............................................................ 2, 10, 11

*Marbury v. Madison*,
   5 U.S. 137 (1803) ..........................................................................12

*McCray v. Md. Dep't of Transp., Md. Transit Admin.*,
   741 F.3d 480 (4th Cir. 2014) ........................................................15

*Moore v. Tangipahoa Par. Sch. Bd.*,
   507 F. App'x 389 (5th Cir. 2013) ............................................ 10, 16

*Olsen v. State of Neb. ex rel. Western Reference & Bond Ass'n*,
   313 U.S. 236 (1941) ...................................................................2, 11

*Planned Parenthood of Greater Ohio v. Hodges*,
   917 F.3d 908 (6th Cir. 2019) ..........................................................9

*Planned Parenthood S. Atl. v. Baker*,
   941 F.3d 687 (4th Cir. 2019) ..........................................................3

*Richland Cty. Sch. Dist. 2 v. Lucas*,
   862 S.E.2d 920 (S.C. 2021) ................................................... *passim*

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995) ........................................................................9

*Rust v. Sullivan*,
   500 U.S. 173 (1991) .............................................................. 1, 4, 9

*S. Bay United Pentecostal Church v. Newsom*,
140 S. Ct. 1613 (2020) ..........................................................7

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
411 U.S. 1 (1973).................................................................16

*Seminole Tribe of Fla. v. Florida*,
517 U.S. 44 (1996)................................................................8

*Stanley v. Darlington Cty. Sch. Dist.*,
84 F.3d 707 (4th Cir. 1996) ................................... 2, 10, 18

*State ex rel. McLeod v. McInnis*,
295 S.E.2d 633 (S.C. 1982) ...................................................2

*Sugarman v. Dougall*,
413 U.S. 634 (1973)...............................................................9

*Tennessee v. Lane*,
541 U.S. 509 (2004)..............................................................11

*Tenney v. Brandhove*,
341 U.S. 367 (1951)..............................................................13

*United States v. Georgia*,
546 U.S. 151 (2006)..............................................................16

*Va. Office for Prot. & Advoc. v. Stewart*,
563 U.S. 247 (2011)..............................................................15

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
535 U.S. 635 (2002)..............................................................13

*Wicomico Nursing Home v. Padilla*,
910 F.3d 739 (4th Cir. 2018) ..............................................15

*Wilson ex rel. State v. City of Columbia*,
863 S.E.2d 456 (S.C. 2021) ................................... 2, 5, 6, 14

## Constitutional Provision

U.S. Const. amend. X........................................................................9, 10

## Statute

42 U.S.C. §12202........................................................................11

## Other Authorities

2021 S.C. Acts No. 94........................................................................5

Consolidated Appropriations Act, 2021,
    Pub. L. 116-260, 134 Stat. 1182 (Dec. 27, 2020)....................................4

Ctrs. for Disease Control & Prevention, *Guidance for COVID-19 Prevention in K-12 Schools* (updated Nov. 5, 2021), https://tinyurl.com/j8w6x88z.......................7

Departments of Labor and Health, Education, and Welfare Appropriations Act, 1977,
    Pub. L. No. 94-439, 90 Stat. 1418 (Sept. 30, 1976)................................3

Joseph Bustos, *Why SC's McMaster Says Kershaw County Schools Are a "Model" District in Slowing COVID*, The State (Sept. 15, 2021),
    https://tinyurl.com/2cavm49s................................................7

*Level of Community Transmission of COVID-19, by State/Territory*, COVID Data Tracker, Ctrs. for Disease Control & Prevention (last visited Nov. 16, 2021),
    https://tinyurl.com/4v786jbn................................................17

S.C. Dep't of Health & Environmental Control, *SCDHEC COVID-19 Guidance for K-12 Schools, 2021-2022 Academic Year* (updated Nov. 5, 2021)
    https://tinyurl.com/4rckyxhx................................................7

*The Federalist No. 45* (J. Madison) (C. Rossiter & C. Kesler eds. 2003)................9

*The Federalist No. 70* (J. Madison) (C. Rossiter & C. Kelser eds. 2003)................9

## INTRODUCTION

After denying the Governor and Attorney General's request to stay the injunction pending appeal, the Court expedited this appeal and ordered supplemental briefing on two questions (Dkt. 46, at 2):

1.      Is the statutory provision at issue a funding provision not unlike the Hyde Amendment?

2.      If it is, do U.S. courts have jurisdiction over funding decisions made by a state legislature?

The answer to the first question is *yes*. A government is constitutionally permitted, through the power of the purse, "to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). The Hyde Amendment represents the federal government's preference for one policy (childbirth) over an alternative (federally funded abortion). The Proviso similarly represents South Carolina's preference for one policy (parental choice) over an alternative (state-funded mask mandates).

The answer to the second question is *no*. In our constitutional system, States retain all sovereignty that was not expressly given to the federal government. This retained sovereignty includes the power to make funding decisions. "It would be an unfathomable intrusion into a state's affairs—and a violation of the most basic

notions of federalism—for a federal court to determine the allocation of a state's financial resources." *Stanley v. Darlington Cty. Sch. Dist.*, 84 F.3d 707, 716 (4th Cir. 1996) (Niemeyer, J.). It is not the place of Article III courts to pass judgment on these types of state funding decisions. *See, e.g.*, *Maher v. Roe*, 432 U.S. 464, 479 (1977) (noting that legislatures are the appropriate forum for the resolution of sensitive policy choices); *see also Olsen v. State of Neb. ex rel. Western Reference & Bond Ass'n*, 313 U.S. 236, 246 (1941) ("We are not concerned, however, with the wisdom, need, or appropriateness of the legislation. Differences of opinion on that score suggest a choice which should be left where it was left by the Constitution— to the states and to Congress." (cleaned up)).

Here, the General Assembly has made a funding decision with respect to the Proviso. *See State ex rel. McLeod v. McInnis*, 295 S.E.2d 633, 637 (S.C. 1982) ("The General Assembly has, beyond question, the duty and authority to appropriate money as necessary for the operation of the agencies of government and has the right to specify the conditions under which the appropriated monies shall be spent."). The Proviso was included in a general appropriations act and relates to the raising and spending of tax monies. *See Wilson ex rel. State v. City of Columbia*, 863 S.E.2d 456, 460 (S.C. 2021). Significantly, as the S.C. Supreme Court has recognized, the State has not banned masks or mask mandates in public schools through the Proviso, and that court has upheld the Proviso in the face of a state-law equal protection

challenge. *See, e.g.*, *Richland Cty. Sch. Dist. 2 v. Lucas*, 862 S.E.2d 920, 923-24 (S.C. 2021). Rather, consistent with the legislative intent to promote parental involvement, the State has simply decided that state-authorized or -appropriated funds may not be used to enforce mask mandates. If a school district wants a mask mandate, it must use federal or local funds to enforce that mandate. South Carolina's sovereign, internal funding decision is not subject to review by federal courts.

## ARGUMENT

### I.    The Proviso is a funding provision like the Hyde Amendment.

Since 1976, Congress has prohibited the use of federal funds to reimburse the costs of abortion, subject to a few exceptions. *See Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 706 (4th Cir. 2019). It has typically done so through an amendment to an annual appropriations bill or joint resolution, commonly known as the Hyde Amendment, named in honor of its original sponsor, Congressman Henry J. Hyde of Illinois. *See Harris v. McRae*, 448 U.S. 297, 302 (1980); *see also* Departments of Labor and Health, Education, and Welfare Appropriations Act, 1977, Pub. L. No. 94-439, §209, 90 Stat. 1418, 1434 (Sept. 30, 1976) (original Hyde Amendment).

Unsurprisingly, the Hyde Amendment was immediately challenged by plaintiffs asserting due process and First Amendment claims. *See Harris*, 448 U.S. at 303, 305. The Supreme Court ultimately rejected those claims, explaining that the

Hyde Amendment "places no governmental obstacle in the path of a woman who chooses to terminate her pregnancy." *Id.* at 315. Instead, the amendment "encourages alternative activity [*i.e.*, childbirth] deemed in the public interest." *Id.* Government is therefore free, the Court held, to choose between public policy goals and to promote some over others. *Id.*; *see also Rust*, 500 U.S. at 193 ("The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way.").

The most recent version of the Hyde Amendment is found in the Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1182 (Dec. 27, 2020). The amendment provides, "None of the funds appropriated in this Act, and none of the funds in any trust fund to which funds are appropriated in this Act, shall be expended for any abortion." *Id.*, Div. H, Title V, §506(a), 134 Stat. at 1622; *see also id.*, Div. H, Title VI, §507(a), 134 Stat. at 1622 (providing exceptions for cases involving rape, incest, and health of the mother). As it has for almost five decades, Congress continues to use the power of the purse to promote one policy (childbirth) over an alternative one (abortion).

The Proviso that the South Carolina General Assembly enacted and Appellees challenged similarly promotes one policy alternative over another by controlling

how public school districts may utilize state funds. *See Wilson*, 863 S.E.2d at 460 ("Proviso 1.108 is reasonably and inherently related to the spending of tax money. It was included as part of the Department of Education's budget and prohibits funds appropriated by the act from being spent on mask mandates in K-12 public schools."). The Proviso states:

> No school district, or any of its schools, may use any funds appropriated or authorized pursuant to this act to require that its students and/or employees wear a facemask at any of its education facilities. This prohibition extends to the announcement or enforcement of any such policy.

2021 S.C. Acts No. 94, Part IB, §1.108. In other words, the General Assembly has prohibited school districts from using state-appropriated or -authorized funds to announce or enforce a mask mandate. *Wilson*, 863 S.E.2d at 458 ("Proviso 1.108 manifestly sets forth the intent of the legislature to prohibit mask mandates funded by the 2021-2022 Appropriations Act in K-12 public schools.").

The Proviso represents the General Assembly's preference "to leave the ultimate decision" on whether children wear masks in schools "to parents," rather than have the government decide whether children must wear masks. *Id.*; *see also id.* at 459 ("The state legislature has elected to leave the decision to parents . . . ."). As the S.C. Supreme Court recognized, "the policy of the state legislature to leave to parents the masking decision is most assuredly well within the broad parameters of the legislature's constitutional boundaries." *Id.* at 460.

Several observations about this policy preference deserve mention. First, the Proviso does not prevent students from wearing masks or ban all mask mandates in public schools. *See Richland Cty. Sch. Dist. 2*, 862 S.E.2d at 924. It simply prohibits school districts from using state-authorized or -appropriated funds to enforce universal mask mandates. Any doubt about the scope of the Proviso's prohibition has been removed by the S.C. Supreme Court. Most recently, days after the district court entered its injunction, the S.C. Supreme Court rejected a state-law challenge to the Proviso by a school district and the parent of a student with disabilities, explaining that, although the Proviso prohibits state funds from being used to implement a mask mandate, the court did "not reject the possibility that funds not appropriated or authorized by [the General Assembly] may be used to announce or enforce a mask mandate." *Id.*; *see also Wilson*, 863 S.E.2d at 458 n.2 (the court "recognize[s] . . . the possibility that a local government could impose a mask mandate without contravening Proviso 1.108"). If school districts want to enact mask mandates (or if, as Appellees contend, districts are required to do so to comply with federal law), the Proviso already permitted them to do so before the district court enjoined it.

Second, "[t]he vast majority of people on all sides of the virus debate want what is best for their loved ones and their communities. They simply disagree with each other and do so respectfully." *Wilson*, 863 S.E.2d at 463 (James, J., concurring).

Given such disagreements and a lack of judicial expertise on debated and evolving medical questions, courts must give great deference to the decisions of elected officials. *See S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613-14 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief).

Third, there are plenty of mitigation strategies associated with COVID-19 other than universal mask mandates. When it comes to schools, separate and apart from masking recommendations, the South Carolina Department of Health and Environmental Control identifies vaccination, physical distancing, contact tracing, isolation, quarantine, testing, screening, ventilation, handwashing, respiratory etiquette, and cleaning and disinfecting as ways to prevent or slow the spread of COVID-19. *See* S.C. Dep't of Health & Environmental Control, *SCDHEC COVID-19 Guidance for K-12 Schools, 2021-2022 Academic Year* 5-10 (updated Nov. 5, 2021) https://tinyurl.com/4rckyxhx. The CDC provides a similar list of mitigation strategies in addition to masking. *See* Ctrs. for Disease Control & Prevention, *Guidance for COVID-19 Prevention in K-12 Schools* (updated Nov. 5, 2021), https://tinyurl.com/j8w6x88z. These other strategies are effective. *See* Joseph Bustos, *Why SC's McMaster Says Kershaw County Schools Are a "Model" District in Slowing COVID*, The State (Sept. 15, 2021), https://tinyurl.com/2cavm49s (describing Kershaw County School District in South Carolina: This district, which never had a mask mandate, "checks temperatures as people come into buildings,

limits the number of visitors, keeps desks at least 3 feet apart, uses seating charts on buses to determine close contacts, disinfects buildings every day and uses plexiglass dividers. [The district also uses] isolation rooms for anyone who displays any symptoms.").

The similarities between the Proviso and Hyde Amendment are apparent. In both contexts, a legislative body had a choice between two constitutionally approved policy choices. Each body had a preference for one policy alternative over the other. Each legislative body used its constitutional spending authority to express and promote one policy option over the other by placing conditions on the use of those funds under its exclusive, sovereign control. The Hyde Amendment is thus an apt comparison for the Proviso.

## II.    Federal courts lack jurisdiction over the State's funding decision.

### A.    The Constitution reserves funding decisions to the States as a part of their retained sovereignty.

"The Constitution specifically recognizes the States as sovereign entities." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 71 n.15 (1996). That founding document thus "establishes a system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). This system is "a defining feature"—not a vice—"of our Nation's constitutional blueprint." *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 751 (2002). In this "happy combination" of the Federal Government and the States, *The Federalist No. 70*, p.

8

77 (J. Madison) (C. Rossiter & C. Kelser eds. 2003), "the States [] retain . . . a very extensive portion of active sovereignty." *The Federalist No. 45*, p. 286 (J. Madison); *see also* U.S. Const. amend. X; *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1780 (2017) ("States retain many essential attributes of sovereignty").

As part of that active sovereignty, the Tenth Amendment reserves to a State "near plenary authority to allocate governmental responsibilities among its political subdivisions." *Bacon v. City of Richmond, Va.*, 475 F.3d 633, 641 (4th Cir. 2007); *see also Sugarman v. Dougall*, 413 U.S. 634, 648 (1973) (noting the respect that must be given to "a State's constitutional responsibility for the establishment and operation of its own government"). Thus, "the federal court *must* . . . respect a State's division of responsibility." *Bacon*, 475 F.3d at 641 (emphasis added); *see also id.* at 640-43 (the City of Richmond could not be liable for the ADA violations of public schools, based on Virginia's allocation of authority between municipality and school district).

Along the same lines, active sovereignty includes the right to choose how to spend public funds. *See Rust*, 500 U.S. at 193; *cf. Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995) ("when the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes"). Thus, "[g]overnments generally may do what they wish with public funds." *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 911 (6th Cir. 2019); *cf. Moore*

*v. Tangipahoa Par. Sch. Bd.*, 507 F. App'x 389, 394 (5th Cir. 2013) ("the implementation of a state legislature's decisions concerning education funding" is "a quintessentially state issue," and "disputes concerning the allocation of the state's financial resources fall within the purview of a state's sovereign power"); *DIRECTV, Inc. v. Tolson*, 513 F.3d 119, 125 (4th Cir. 2008) (refusing to entertain a challenge to state tax law and noting "the principle of comity reflects the recognition that states should be free from federal interference in the administration of their fiscal operations"); *Lawyer v. Hilton Head Pub. Serv. Dist. No. 1*, 220 F.3d 298, 302-04 (4th Cir. 2000) (concluding that principles of comity serve as a jurisdictional bar to plaintiffs' claims to state tax law).

Given this retained aspect of sovereignty, federal courts do not have the power under Article III to review and direct how a State decides to spend, or not to spend, those funds under its exclusive control. *See* U.S. Const. amend. X; *Horne v. Flores*, 557 U.S. 433, 448 (2009) ("Federalism concerns are heightened when . . . a federal court decree has the effect of dictating state or local budget priorities."). As this Court has observed, "[i]t would be an unfathomable intrusion into a state's affairs— and a violation of the most basic notions of federalism—for a federal court to determine the allocation of a state's financial resources." *Stanley*, 84 F.3d at 716. This is particularly true when questions are "fraught with judgments of policy and value over which opinions are sharply divided." *Maher*, 432 U.S. at 479 (a State is

not required to fund nontherapeutic abortions). In such instances, "the appropriate forum for [the question's] resolution in a democracy is the legislature." *Id.*; *see also Olsen*, 313 U.S. at 246; *Fam. Plan. Ass'n of Me. v. U.S. Dep't of Health & Hum. Servs.*, 404 F. Supp. 3d 286, 290 (D. Me. 2019) (courts are not "the Oracle of Delphi heroically saving the republic from the product of its own democratic process").

Likewise, Congress has never abrogated (nor presumably, could Congress abrogate) state sovereign immunity regarding funding decisions. To be sure, Congress can abrogate sovereign immunity under section 5 of the Fourteenth Amendment. *See, e.g.*, *Tennessee v. Lane*, 541 U.S. 509 (2004) (valid abrogation under Title II in cases implicating the fundamental right of access to the courts). Congress has even purported to do so in the ADA. *See* 42 U.S.C. §12202. But such an abrogation does not extend as far as giving federal courts the power to review how States decide to fund any compliance with a requirement of federal law. For example, federal courts may prohibit school segregation, "but in no way does it follow that the judiciary has any corresponding authority to dictate the specific financial arrangements under which the costs of integrating the schools shall be handled." *Kelley v. Metro. Cty. Bd. of Educ. of Nashville & Davidson Cty., Tenn.*, 836 F.2d 986, 995-96 (6th Cir. 1987). Put another way, abrogation of sovereign immunity that allows a State to be sued under a provision of federal law is not also

an abrogation of sovereign immunity that allows a State to be sued about how it or its political subdivisions will pay to comply with that federal law.

In multiple respects, this conclusion is consistent with Article III jurisprudence. First, this conclusion is consistent with long-standing jurisdictional rules about remedies. It has always been an essential question for federal courts whether "the laws of [this] country afford [the plaintiff] a remedy" for the alleged wrong. *Marbury v. Madison*, 5 U.S. 137, 154 (1803). If the remedy the plaintiff seeks isn't available, then a federal court has no power to decide the case. *See id.* at 173-80 (discussing the Supreme Court's lack of authority to issue a writ of mandamus). In other words, an available remedy is essential to jurisdiction.

Second, this conclusion comports with doctrines like standing and mootness that ensure courts can grant effective relief. Standing, for example, is jurisdictional under Article III and requires redressability, meaning "that it must be likely, and not merely speculative, that a favorable decision will remedy the injury." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000). Mootness, which is also an Article III doctrine, likewise ensures that a court can "grant effective relief to the prevailing party." *CVLR Performance Horses, Inc. v. Wynne*, 792 F.3d 469, 474 (4th Cir. 2015).

Third, this conclusion fits with caselaw regarding who is a proper defendant in federal court. For instance, legislators cannot be sued about funding decisions

because they enjoy legislative immunity. *See Tenney v. Brandhove*, 341 U.S. 367, 377 (1951). Nor is the "Governor's general authority" as the State's chief executive and "the Attorney General's role as a legal advisor" sufficient to make them proper defendants in federal court. *Doyle v. Hogan*, 1 F.4th 249, 255 (4th Cir. 2021). Ultimately, a proper defendant must be an official who has "some connection with the enforcement of the act." *Ex parte Young*, 209 U.S. 123, 157 (1908). *Ex parte Young* applies only when the plaintiff alleges "an ongoing violation of federal law" and seeks "prospective" relief. *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). Otherwise, a lawsuit against that official "is merely making him a party as a representative of the state, and thereby attempting to make the state a party." *Ex parte Young*, 209 U.S. at 157. A State's self-executing funding decision like the Proviso has no official subject to federal jurisdiction charged with enforcing it, so there is no way for a federal court to review the funding decision. *See Doyle*, 1 F.4th at 255. Any defendant (the Governor, Attorney General, or even the State Superintendent of Education) is merely a placeholder for the State.

**B.      The district court wrongly exercised jurisdiction over the State's funding decision.**

The Proviso is a funding decision, nothing more: Any mask mandate may not be enforced with the State's funds. South Carolina has not banned masks in schools. *See Richland Cty. Sch. Dist. 2*, 862 S.E.2d at 924 ("Proviso 1.108 does not limit a student's right to a free education or prohibit students from wearing masks."). Nor

has it banned mask mandates. *See id.* (mandates could be enforced "exclusively with federal or local funds"). Instead, when presented with the question of "whether parents of school children should decide whether their children must wear masks at school or whether the government should mandate that decision," *Wilson*, 863 S.E.2d at 458, the General Assembly used its power of the purse to express its preference for the former over the latter. By exercising jurisdiction over Appellees' claims based on the Proviso, the district court violated basic principles of federalism.

The district court's error here is even more egregious because it is limited only to enjoining the Proviso, without requiring mask mandates. Under the district court's injunction, not a single school is required to mandate masks. (Hence plaintiffs' lack of standing, another jurisdictional defect. *See* Br. of Appellants 12-15.) Instead, the district court only overturned the General Assembly's decision as to whether state funds are available to school districts should they choose to adopt and enforce a mask mandate. The district court somehow concluded that not using state-authorized or -appropriated funds for mask mandates violates Title II and §504, but that Title II and §504 give school districts the freedom to decide whether to enact mask mandates, with or without state funds. *See* J.A.292. In other words, instead of saying "the State must spend its funds to comply with federal law," (a conclusion itself which would be flawed), the district court said, "school districts are free to disregard the General Assembly's funding decisions, if they choose." Nothing in Article III

(or anywhere else in the Constitution) gives federal courts the authority to require such a reordering of the State's fiscal affairs.

Or view this issue through the lens of the Eleventh Amendment. *See McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014) (Eleventh Amendment immunity can be raised for the first time on appeal). Even if Congress has validly abrogated state sovereign immunity under Title II in certain circumstances involving public education (and there is some authority that that attempted abrogation is not valid, *see Biggs v. Bd. of Ed. of Cecil Cty., Md.*, 229 F. Supp. 2d 437 (D. Md. 2002)), Congress has not abrogated, and could not constitutionally abrogate, a State's sovereign immunity from claims like the ones Appellees assert. The Eleventh Amendment bars suits against States or their officials for money damages. *See Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 747 (4th Cir. 2018). After all, it is axiomatic that "state sovereign immunity serves the important function of shielding state treasuries and thus preserving the States' ability to govern in accordance with the will of their citizens." *Fed. Mar. Comm'n*, 535 U.S. at 765 (internal quotation mark omitted); *see also Va. Office for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 258 (2011) ("The specific indignity against which sovereign immunity protects is the insult to a State of being haled into court without its consent. That effectively occurs, our cases reasonably conclude, when (for example) the object of the suit against a state officer is to reach funds in the state treasury . . . .").

Here, despite Appellees attempting to frame their case as seeking prospective relief, *see* J.A.29, they challenged a provision in the State's budget, asking the district court to enjoin the Proviso and force South Carolina to spend its funds on mask mandates. Having agreed to set aside the sovereign "shield" to the State's Treasury, the district court's injunction here is nothing more than an order telling the State how to spend—and directing that it must spend—its money, which is no different than ordering a State to pay money damages. *See Moore*, 507 F. App'x at 394 (emphasizing that where injunctive relief seeks "to prevent the implementation of the state legislature's decisions concerning education funding, a quintessentially state issue," "the essence of the relief sought is not injunctive but rather monetary" because "enjoining the State from 'failing to pay' is little less than telling the State *to* pay").

The Supreme Court has held that Title II validly abrogates state sovereign immunity for money damages only for "conduct that *actually* violates the Fourteenth Amendment." *United States v. Georgia*, 546 U.S. 151, 159 (2006). Appellees have never contended that not allowing school districts to use state funds to impose universal mask mandates violates the Fourteenth Amendment. Nor could they. Education is not a fundamental right for substantive due process purposes. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35-39 (1973). And Appellees have pointed to nothing in the historical record to suggest the original understanding

of the Fourteenth Amendment requires such unprecedented actions be taken in public schools. Moreover, they have not suggested that anything other than intentional government conduct could violate the Fourteenth Amendment, and their claims are based on disparate-impact and failure-to-accommodate theories only (for which, by the way, they do not have a private right of action, *see* Br. of Appellants 20-27). Thus, there has not been—and could not be—a valid abrogation of South Carolina's sovereign immunity to order the State to spend its funds on mask mandates.

Before Appellees claim the sky is falling, it's worth noting two important limits here. First, and as *Stanley* should make clear, this rule does not mean that Appellees have no way to vindicate their alleged rights under Title II or §504. Even assuming Title II and §504 did validly abrogate state sovereign immunity for all things related to K-12 public education, a plaintiff nevertheless must assert a claim against the alleged wrongdoer. In this case, that is the school districts where Appellees' children attend school.[*] They have the ultimate authority to decide

---

[*] South Carolina currently has the lowest level of community transmission of any State. *See Level of Community Transmission of COVID-19, by State/Territory*, COVID Data Tracker, Ctrs. for Disease Control & Prevention (last visited Nov. 16, 2021), https://tinyurl.com/4v786jbn. As COVID-19 cases across the State and in schools have plummeted over the past two months, an open question in this case is whether Appellees' children are attending school in person. If they have, that raises significant standing and mootness concerns and offers further support for Appellants' previous arguments. *See* Br. of Appellants 10-15.

whether to require all teachers, students, staff, and visitors to wear masks, as federal and local funds can still be used, with or without the Proviso, to implement mask mandates. *See Richland Cty. Sch. Dist. 2*, 862 S.E.2d at 924. The Proviso therefore does not prevent mask mandates and cannot violate Title II or §504. "For the federal courts to impose funding obligations" on the State by enjoining the Proviso "in the absence of underlying legal violations" by the State or its officials "simply shortcircuits the legal and political process that states have put into place for the support of public schools." *Bacon*, 475 F.3d at 645.

Second, this issue would be different if South Carolina had banned masks or mask mandates in public schools. In that scenario, there wouldn't be a funding decision but a substantive policy decision. Plaintiffs could (assuming no other jurisdictional hurdles) assert their Title II and §504 claims against the appropriate state officials (not that those claims would prevail). *See Stanley*, 84 F.3d at 713 (recognizing that both the State and school district could have potentially been liable to remedy school segregation). But South Carolina has not prohibited masks or mask mandates. It has merely expressed its own preference for ensuring that the State's funds are not used in a manner that forecloses parental involvement and for COVID-19 mitigation strategies other than mask mandates. To that end, the General Assembly decided that local school districts must use funds other than those appropriated by the State to enforce any mandates the districts choose (or are

purportedly required by federal law) to enact. Neither this preference nor this funding approach violates Appellees' rights or subjects the State's fiscal decisions to federal judicial review. *Cf. Bacon*, 475 F.3d at 638 (it is "beyond the limits of judicial power to interfere with the operation of entities that have not violated plaintiff's rights").

<center>*     *     *</center>

When the Supreme Court upheld the Hyde Amendment in *Harris*, it did so on the merits. That makes sense: a federal court was reviewing an act of Congress, and the plaintiffs—Medicaid recipients—would have received the funding at issue. *See Harris*, 448 U.S. at 303. But a State's allocation of responsibility between it and its subdivisions for funding decisions purportedly required by federal law is not susceptible to federal court review. That is especially true when the funding decision has no necessary connection to the claimed violation of federal law, and the political subdivisions (rather than Governor or Attorney General) set the policies that supposedly violate federal law. Our constitutional structure commits such funding allocation decisions to the States (and their courts), and federal courts lack the constitutional power to review those decisions.

## <center>CONCLUSION</center>

For the foregoing reasons, the Court should reverse the district court's preliminary injunction order.

Respectfully submitted,

s/Wm. Grayson Lambert
Thomas A. Limehouse, Jr.
*Chief Legal Counsel*
Wm. Grayson Lambert
*Senior Legal Counsel*
Michael G. Shedd
*Deputy Legal Counsel*
OFFICE OF THE GOVERNOR
South Carolina State House
1100 Gervais Street
Columbia, South Carolina 29201
(803) 734-2100
tlimehouse@governor.sc.gov
glambert@governor.sc.gov
mshedd@governor.sc.gov

*Counsel for Governor Henry McMaster*

Alan Wilson
*Attorney General*
Robert D. Cook
*Solicitor General*
J. Emory Smith, Jr.
*Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 11549
Columbia, South Carolina 29211
(803) 734-3680
rcook@scag.gov
esmith@scag.gov

*Counsel for Attorney General Alan Wilson*

# CERTIFICATE OF COMPLIANCE

1.    This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

This brief contains *4,730* words (and *12,955* words when combined with Appellants' opening brief).

2.    This brief complies with the typeface and type style requirements because:

This brief has been prepared in a proportionally spaced typeface using *Microsoft Word* in *14 pt Times New Roman*.


Dated: <u>November 17, 2021</u>      <u>s/Wm. Grayson Lambert</u>
                                       *Counsel for Henry McMaster*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 17th day of November, 2021, I caused this *Supplemental Brief of Appellants* to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all counsel of record.

<div style="text-align: right">

s/Wm. Grayson Lambert
*Counsel for Henry McMaster*

</div>